## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                     :

RIVERKEEPER, INC.,                :   Case No. 14-cv-3762
                                       :

             Plaintiff,      :   **COMPLAINT FOR**
                                       :   **DECLARATORY AND**

     v.                     :   **INJUNCTIVE RELIEF AND**
                                       :   **CIVIL PENALTIES**

MLV CONCRETE INC., EMPIRE TRANSIT :
MIX INC., and ROCCO TOMASSETTI, :   (Federal Water Pollution Control
                                       :   Act, 33 U.S.C. §§ 1251 to 1387)

            Defendants.   : 
                                       X
------------------------------------------------------------

Plaintiff Riverkeeper, Inc. by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act," "the Act," or "CWA") to address and abate Defendants' MLV Concrete Inc., Empire Transit Mix Inc., and Rocco Tomassetti (herein referred to as Defendants) ongoing and continuous violations of the Act.

2.     The Defendants discharge polluted stormwater runoff from the ready mix concrete facility located at 160 3rd Street, in Brooklyn (the "Facility"), into the Gowanus Canal without authorization, in violation of Sections 301(a) and 402(p)(2)(B) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p)(2)(B).  Defendants have failed to obtain coverage under and comply with the conditions of an individual National Pollutant Discharge Elimination System ("NPDES") permit or the State of New York, General Permit for the Discharge of Stormwater

Associated with Industrial Activity ("the General Permit") issued by the New York State Department of Environmental Conservation ("DEC"), in violation of Sections 402(p)(3)(A) and (p)(4)(A) of the CWA, 33 U.S.C. §§ 1342(p)(3)(A) and (p)(4)(A), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

3.      Stormwater runoff is one of the most significant sources of water pollution in the nation, comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into the New York Harbor, Long Island Sound, and other receiving waters in this District.  The State of New York has designated more than 6,676 river miles, 317,000 acres of larger waterbodies, 560 square miles of harbors, bays and estuaries, 778 acres of wetland, and 592 miles of Great Lakes shoreline in the State as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

4.      Defendants' stormwater discharges contribute to this endemic stormwater pollution problem.  Defendants engage in industrial activities that include the purchase, collection, processing, and outdoor storage of sand, aggregate, Portland cement, and other substances used in manufacturing, loading, and delivering ready mix concrete.  The Facility also a ready mix concrete plant.  All of these are potential sources of industrial pollutants. Defendants mix raw materials into concrete on site and transfer the concrete to trucks.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those

pollutants to the Gowanus Canal.  Contaminated stormwater discharges such as those from the Facility can and must be controlled to the fullest extent required by law in order to allow the Gowanus Canal a fighting chance to regain its health.

## II.

### JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1) and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6.      Riverkeeper has complied with the notice requirements under Section 505(b)(1) of the CWA, 33 U.S.C. § 1365(b)(1).

7.      On February 28, 2014, Riverkeeper provided notice of Defendant's violations of the Act and of its intention to file suit to Defendant; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of DEC, as required by the Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and correct copy of Riverkeeper' notice letter is attached as Exhibit A, and is incorporated by reference.

8.      More than sixty days have passed since the notice letter was served on Defendant and the state and federal agencies.

9.      Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

10.     This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

11.     Venue is proper in the Eastern District of New York pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

## III.

## PARTIES

12.     Plaintiff Riverkeeper, Inc. is a not-for-profit environmental organization organized under the laws of the state of New York, with its principal place of business in Ossining, New York.  Riverkeeper's mission includes safeguarding the ecological and biological integrity of the Hudson River and its tributaries.  Riverkeeper was originally founded by the Hudson River Fisherman's Association, a group of fishermen concerned about the ecological state of the Hudson River, and the effect of its polluted and degraded condition on fish. Riverkeeper achieves its mission through public education, advocacy for sound public policies and participation in legal and administrative forums.  Riverkeeper has more than 3,250 members, many of whom reside near to, use and enjoy the Hudson River and the waters and tributaries of New York Harbor, including more than one hundred members that live in close proximity to the Gowanus Canal, which is polluted by industrial stormwater runoff from the Defendants' ready mix concrete plant.

13.     Riverkeeper's members use and enjoy the waters which Defendants have unlawfully polluted and are unlawfully polluting.  Many of Riverkeeper's members live near the Gowanus Canal, participate in community activities focused around the Gowanus Canal, and recreate upon and alongside the waters of New York Harbor, including the Gowanus Canal. Water quality in the Gowanus Canal (and by extension, in New York Harbor) directly affects the

health, recreational, aesthetic, commercial, and environmental interests of Riverkeeper's members.  The interests of Riverkeeper's members are being, and will be, adversely affected by Defendants' failure to comply with the requirements of the Clean Water Act.

14.     The relief sought herein will redress the harms to Riverkeeper and its members caused by the Defendants' activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Riverkeeper and its members, for which harm they have no plain, speedy or adequate remedy at law.

15.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant MLV Concrete Inc. ("MLV") is a corporation incorporated under the laws of the State of New York, that owns and operates a ready mix concrete plant at160 3rd Street.

16.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Empire Transit, Inc. is a corporation incorporated under the laws of the State of New York, is MLV's parent corporation and sole owner, and controls the decisions and operations of MLV with respect to the options of the ready mix concrete plant at160 3rd Street.

17.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Rocco Tomassetti is the real person who operates both MLV and Empire Transit Inc. and is the owner and the executive in charge of both companies.  Thus, Rocco Tomassetti controls operation of the ready mix concrete plant at160 3rd Street.

## IV.

### STATUTORY AND REGULATORY BACKGROUND

#### The Clean Water Act

18.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA Section 101(a), 33

U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

19.     The CWA prohibits the discharge of pollutants from a "point source" into the waters of the United States without a NPDES permit.  A NPDES permit requires dischargers of pollution to comply with various limitations.

20.     NPDES permits are issued by EPA or by States that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  *See* 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

21.     In New York, DEC has been delegated the authority to issue NPDES permits.

### Stormwater Permits

22.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

23.     Section 402(p) establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program.  33 U.S.C. § 1342(p).  Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

24.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

6

25.     Sections 402(p)(2)(B) and 402(p)(3)(A) and 402(p)(4)(A) of the Act, 33 U.S.C. § 1342(p)(2)(B), (p)(3)(A) and (p)(4)(A), and the stormwater discharge regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

26.     40 C.F.R. § 122.26(c)(1) provides that dischargers of stormwater associated with industrial activity must apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit.

27.     40 C.F.R, § 122.26(b)(13) defines "storm water" to include stormwater runoff, snow melt runoff, and surface runoff and drainage.

28.     40 C.F.R. § 122.26(b)(14) specifies that "storm water discharge associated with industrial activity" includes stormwater discharge from facilities classified under Standard Industrial Classification ("SIC") code 3273 (ready mixed concrete).  Facilities in this industrial category must obtain NPDES permit coverage for their stormwater discharges.

<u>**New York's General Permit for the Discharge**</u>
<u>**of Stormwater Associated with Industrial Activity**</u>

29.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  The current version of the "Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity," Permit No. GP-0-12-001 (the "General Permit") came into effect on October 1, 2012 and remains in effect.

30.     In order to discharge polluted stormwater lawfully in New York, industrial dischargers must obtain coverage under the General Permit and comply with its terms, or obtain coverage under and comply with an individual NPDES permit.

31.     To obtain coverage under the General Permit, a facility discharging stormwater associated with industrial activity is required to submit to DEC a registration form called a "Notice of

7

Intent" to be covered under the General Permit.

32.     In order to comply with the General Permit, a facility owner or operator must reduce the discharge of pollution from the facility to the extent practicable through use of the best available technology for the industry.

33.     The owner or operator also must comply with numeric effluent limitations on the quantity and concentration of pollutants discharged from the facility established in the General Permit, as well as narrative ("non-numeric") effluent limits established in the General Permit.

34.     Typically, facility owners and operators reduce pollution to the extent practicable through use of the best available technology for the industry, and comply with effluent limitations, by adopting "best management practices" that reduce the discharge of polluted stormwater.  Best management practices include both changes to industrial practices and activities (for example, more frequent inspections and site clean ups) and structural changes to the property that prevent stormwater from coming into contact with pollutants in the first place and that otherwise reduce the amount of polluted stormwater eventually discharged from the facility.

35.     Before submitting a registration form to DEC, the owner or operator of a facility discharging stormwater associated with industrial activity must first prepare, make available, and implement a Storm Water Pollution Prevention Plan ("SWPPP").  Among other things, the SWPPP must document the best management practices that the facility has implemented to ensure that it is reducing the discharge of pollution from the facility to the extent practicable through use of the best available technology for the industry.

36.     In addition, the owner or operator must perform inspections, conduct monitoring and sampling, and meet other requirements of the General Permit.  The SWPPP must establish a

plan for and document compliance with these inspection, monitoring, sampling, and other requirements as well.

**CWA Citizen Enforcement Suits**

37.     Under CWA Section 505(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.  33 U.S.C. § 1365(a)(1).

38.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of Section 301 of the CWA, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.  *See* CWA Section 505(f), 33 U.S.C. § 1365(f).

39.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

40.     Injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a).

41.     Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation (for violations occurring after January 12, 2009).  *See* 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4.

**V.**

**STATEMENT OF FACTS**

**Defendants Control Industrial Activities at the Facility**

42.     On information and belief, Defendants currently control industrial operations at the Facility.

43.     On information and belief, Defendants have controlled industrial operations at the

Facility, directly or through a related entity, since at least 1998.

44.     Because the Defendants control the industrial activities that take place at the Facility, the Defendants are responsible for managing stormwater at the Facility associated with those activities in compliance with the Clean Water Act.

45.     The Defendants are the persons, as defined by 33 U.S.C. § 1362(5), responsible for the violations alleged in this Complaint.

## Defendants' Industrial Activities Expose Pollutants to Stormwater

46.     The activities and practices of Defendant at the Facility expose materials and pollutants to stormwater.

47.     The Facility houses a ready mix concrete plant and materials piles, and receives and loads cement trucks.

48.     The equipment, vehicles and materials at the Facility are all potential sources of industrial pollutants, including aggregate, sand, Portland cement, cement additives, and minerals and waste materials reused in concrete manufacture such as shale, clay, limestone, slate, slag, pumice, fly ash, and baghouse settled dust.

49.     If specialty concretes or cast/formed products are demanded by a customer, the Facility may also house form release agents, latex sealants, and bitumastic coatings.

50.     Machinery on the site also can release into the environment fuel, oil, lubricants, PCBs, polycyclic aromatic hydrocarbons (PAHs), an array of metals, pH-affecting substances and chemical residues.

51.     Active vehicles at the Facility also release pollutants to the environment, including gasoline, diesel fuel, anti-freeze, and hydraulic fluids.

52.     Further, vehicles at the Facility track dust, particulate matter, and other

contaminants to areas on and off the premises from which these pollutants can enter stormwater and, ultimately, waters of the United States.

53.     Because the Defendants fail to adequately shelter and otherwise contain these materials to prevent their release to the environment, precipitation falls on and flows over exposed materials, fluids, and particulates. Stormwater picks up wastes including but not limited to lead, iron, zinc, oil and grease, materials that generate Chemical Oxygen Demand, and pH altering pollutants.

54.     A number of these pollutants can suspend or dissolve in stormwater.

**Defendants Discharge Stormwater from the Facility to Waters of the United States**

55.     With every rain storm or snow melt, polluted stormwater discharges from the Facility.  Stormwater containing the pollutants described above is conveyed off-site into waters of the United States both directly overland and by infiltration of pollutants into and through shallow groundwater that is immediately hydrologically connected to the Gowanus Canal.

56.     The Facility is located directly alongside the Gowanus Canal.

57.     The piles of material, mixing area, and loading area for cement trucks are separated from the Gowanus Canal by a wall of concrete blocks that are spaced slightly apart and are not mortared together.

58.     The base of the easternmost conveyor belt and the hopper for conveyed materials are located on the southeastern edge of the property, near the edge of the Gowanus Canal.

59.     Defendants have discharged stormwater associated with industrial activities into the Gowanus Canal for many years.

60.     Initially - before sending  notice of intent to sue – Riverkeeper observed a number of exposed pollution sources and indicators of historic and ongoing stormwater discharge

11

including most visibly sand, aggregate (gravel) and other materials sitting exposed to rain in large piles at the Facility, towards its southern and western end, next to the Gowanus Canal. Some sand and aggregate were visible in small piles on the canalward side of the concrete blocks that line the water's edge – this material had been placed over the concrete block walls but had not yet been washed into the canal by stormwater.

61.     Riverkeeper also reviewed a bathymetric map of the Gowanus Canal, prepared for the EPA, showing a four to five foot rise on the southwest side of the Facility. Riverkeeper believes and alleges that this underwater mounding is attributable to aggregate and sediment that has been washed off of the Facility by stormwater and has accumulated at the bottom of the canal.

62.     Further, in November 2013, Riverkeeper observed discharge from a pipe at the Facility into the Gowanus Canal.  Next to the pipe was a spray painted identifying mark: "W-024."

63.     EPA assigned the identifying label of "W-024" to this outfall in 2010, while conducting a remedial investigation and feasibility study of the Gowanus Canal.

64.     After Riverkeeper sent notice of intent to sue, Riverkeeper observed improvements in stormwater management at the Facility.  Piles of material are now set further back from the water, the active areas are generally better maintained, and outfall W-024 has been capped with cement, preventing further discharge from that outfall.

65.     But as of the date of this complaint, despite making the noted improvements, Defendants still discharge polluted stormwater associated with industrial activities to the Gowanus Canal and therefore still require General Permit coverage.

66.     The Facility's perimeter walls, buildings, graded surfaces (including the

driveway), vehicles and raw material piles trap and channel polluted stormwater.  Because all or nearly the entire surface of the Facility is sealed, any rain that falls on the Facility accumulates and cannot filter into the soil.  It must and will find a pathway to the Gowanus Canal:

    (a) When it rains, stormwater carries sand, aggregate and a mix of pollutants across the southern portions of the site towards the canal, where the polluted stormwater is channelled through gaps in the concrete blocks and then into the water below.

    (b) Stormwater also accumulates at the southeastern edge of the facility, along a low concrete curb.  When sufficient stormwater accumulates, the curb overtops and polluted stormwater discharges into the canal.

    (c) Some of the Facility's stormwater also flows northwards and forms a channel carrying pollution from the Facility along the western edge of the facility driveway and into a storm sewer on 3rd Street.  Riverkeeper is informed and believes that Defendant's polluted stormwater entering the 3rd street sewer is conveyed via that sewer into the Gowanus Canal.

    (d) Additionally, material deposited on the wrong side of the concrete wall, on the ledge above the Canal, flows directly into the canal when it rains.

    (e) Vehicles track sediment and other pollutants off-site and into the public way.  Storm sewers carry this pollution into the Gowanus Canal as well.

    67.    Riverkeeper has not been able to visit the Facility to conduct a more thorough inspection.  In addition to the visible surface flows of polluted stormwater into the Gowanus Canal, to the extent that there are any remaining unpaved areas of the Facility to which stormwater is conveyed and that Riverkeeper has not been able to observe – such as a drywell – there is also a point source discharge of polluted stormwater into the Gowanus Canal that is

conveyed through shallow groundwater that is directly hydrologically connected to the Gowanus Canal. Thus, pollutants dissolved in infiltrated stormwater at the Facility migrate quickly to the Gowanus Canal.

68.     Pollutants entering the Gowanus Canal also flow into the larger New York Harbor.

69.     The Gowanus Canal is a "water of the United States," as defined in 40 C.F.R. § 122.2 and, therefore, a "navigable water" as defined in Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

70.     The Gowanus Canal consistently fails to meet state water quality standards.

71.     DEC has designated the Gowanus Canal as an impaired water pursuant to Section 303(d) of the CWA, 33 U.S.C. § 1313(d), for failure to meet minimum water quality standards due to high oxygen demand (low levels of dissolved oxygen) and the presence of floatables (debris) attributable in part to urban stormwater runoff. *See* DEC, "Impaired/Delisted Waters NOT Included on the 2012 Section 303(d) List Aug 2012," available at http://www.dec.ny.gov/docs /water_pdf/303d notlisted12.pdf.

72.     On information and belief, stormwater discharges from Defendants' Facility contribute to the ongoing impairment of the Gowanus Canal by releasing oxygen demanding chemicals and other pollutants that contribute directly to the Gowanus Canal's impaired status.

### Defendant has not Obtained Permit Coverage for These Discharges

73.     As of February 28, 2014, the Facility was not covered by an individual NPDES permit.

74.     As of February 28, 2014, the Facility was not covered by the General Permit.

75.     As of February 28, 2014, Defendants had not filed a registration with DEC

seeking General Permit coverage for the Facility.

76.     As of February 28, 2014, Defendants had not complied with any provisions of the General Permit.

77.     Accordingly, on February 28, 2014, Riverkeeper sent Defendants via certified mail the notice of intent to sue described above and attached to this complaint.

78.     On information and belief, as of the date of filing of this complaint, the Facility still lacks NPDES permit coverage.

79.     Defendant's violations of the CWA at the Facility are ongoing and continuous, are capable of repetition, and result from the same underlying and inadequately resolved causes.

**VI.**

**CLAIMS FOR RELIEF**

**<u>FIRST CAUSE OF ACTION</u>**

**Unlawful Discharge of Pollutants
(Violations of 33 U.S.C. §§ 1311, 1342)**

80.     Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

81.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

82.     Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines "person" to include "an individual, corporation, partnership [or] association."

83.     Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a

pollutant" to include "any addition of any pollutant to navigable waters from any point source."

84.     Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, among other things, industrial wastes, chemical wastes, biological materials, rocks, sand, and garbage discharged into water.

85.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

86.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

87.     40 C.F.R. § 122.2 defines "waters of the United States" to include, among other things:  (i) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (ii) all interstate waters; (iii) tributaries to such waters; (iv) wetlands adjacent to such waters or their tributaries; and (v) all other waters the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce.

88.     Section 402(p) of the CWA, 33 U.S.C. § 1342(p) and the implementing regulation found at 40 C.F.R. § 122.26(a)(1)(i) require that facilities discharging stormwater associated with industrial activity obtain a NPDES permit.

89.     Defendants have discharged and continue to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States without a NPDES permit.

90. Each and every day on which Defendants discharge stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

91. Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

92. Wherefore, Riverkeeper prays for relief as hereinafter set forth.

### SECOND CAUSE OF ACTION

**Failure to Apply for NPDES Permit Coverage**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

93. Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

94. 40 C.F.R. § 122.26(c)(1) and 122.26(e)(1) require dischargers of stormwater associated with industrial activity to apply for an individual permit or seek coverage under a promulgated stormwater general permit by October 1, 1992.

95. Since at least 1998, Defendants have operated and continue to operate a facility that engages in ''industrial activity'' as that term is defined in 40 C.F.R. § 122.26(b)(14).

96. Since that time, Defendants have routinely discharged polluted stormwater associated with industrial activity from the facility to waters of the United States.

97. Therefore, since that time, Defendants have been obligated to apply for coverage under an individual or general NPDES permit.

98. Once the Defendants began discharging polluted stormwater associated with industrial activity to waters of the United States, each and every subsequent day on which Defendants have failed to apply for permit coverage constitute a separate and distinct violation of

17

Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

99.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

100.    Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION

### Failure to Implement Adequate Control
### Measures and Best Management Practices
### (Violations of 33 U.S.C. §§ 1311, 1342)

101.    Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

102.    The General Permit, in Parts I.B and VII, requires that Defendant implement mandatory general and sector-specific control measures called Best Management Practices ("BMPs") in order to minimize the discharge of pollutants from the Facility.

103.    The selected measures must reduce the discharge of pollution from the Facility to the extent practicable through use of the best available technology for the industry in order to comply with both numeric and narrative effluent limits contained in the permit.

104.    For example, the General Permit requires that Defendants minimize the exposure of pollutants to stormwater (*see* General Permit Part I.B.1.a.2.a) in the first place and, to the extent that pollutants are exposed to stormwater despite Defendants' best efforts, the Defendants must also minimize the ultimate discharge of those pollutants in stormwater from the facility. *See* General Permit Part I.B.1.a.2.f.

105.    In this context, to "minimize" means to "reduce and/or eliminate to the extent achievable using control measures (including best management practices) that are

18

technologically available and economically practicable and achievable in light of best industry practice." General Permit, Part I.B.1.

106. To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology Economically Achievable ("BAT" or "BATEA"), Best Conventional Pollutant Control Technology ("BCT") and/or Best Practicable Control Technology Currently Available ("BPT"), depending upon the type of pollutant being discharged.

107. Because the industrial activities carried out at the Facility are categorized in SIC Code 3273, Defendant must also implement the sector-specific control measures specified in Part VIII of the General Permit for Sector E.

108. Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not fully implemented the control measures or BMPs required by the General Permit.

109. Defendants have failed, and continue to fail, to implement adequate control measures and BMPs at the Facility as required by the General Permit.

110. Each and every day on which Defendants fail to comply with the General Permit's control measure and BMP requirements is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

111. Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

112. Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### Failure to Develop and Implement an Adequate
### Storm Water Pollution Prevention Plan
### (Violations of 33 U.S.C. §§ 1311, 1342)

113.    Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

114.    Part III of the General Permit requires industrial dischargers to develop, implement and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

115.    As described in Part III.A of the General Permit, the SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.

116.    Further, the SWPPP must describe and ensure the implementation of best management practices that minimize the discharge of pollutants in stormwater and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

117.    The SWPPP must address, at a minimum: (1) each of the elements set forth in Part III.C of the General Permit; (2) each of the applicable sector-specific plan elements specified in Part VIII of the General Permit and, (3) as applicable, each of the additional special requirements listed in Part III.F of the General Permit for industrial activities that discharge through a municipal separate storm sewer or to impaired waterbodies, activities that take place at facilities that report under the federal Emergency Planning and Community Right to Know Act, and facilities that use secondary containment measures. The SWPPP must include records and documentation of compliance with each of these elements and requirements.

118.    The SWPPP must be representative of current site conditions and kept up to date.

20

119.    The SWPPP must be signed in accordance with Part V.H of General Permit.

120.    At an active facility, the SWPPP must be kept on-site at all times.

121.    The SWPPP must be prepared and must provide for compliance with the terms of the General Permit on or before the date of submission of a Notice of Intent to be covered under the General Permit.

122.    Because the industrial activities carried out at the Facility are categorized in SIC Code 3273, Defendant must include the sector-specific SWPPP elements specified in Part VIII of the General Permit for Sector E, in addition to the SWPPP elements set forth in Part III of the General Permit.

123.    Under Part III.D.2 of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within 14 days of receipt of a written request."

124.    Riverkeeper requested a copy of Defendant's SWPPP on February 28, 2014.

125.    Defendants have not provided Riverkeeper with a copy of a SWPPP.

126.    Riverkeeper alleges that, as of the filing date of this complaint, Defendants have not developed an adequate SWPPP.

127.    Defendants have failed, and continue to fail, to develop, implement and maintain compliance with an adequate SWPPP for the Facility as required by the General Permit and to take the other SWPPP-related actions required by the General Permit and described herein.

128.    Each and every day on which Defendants fail to comply with the General Permit's SWPPP requirements are a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

129.    Continuing commission of the acts and omissions alleged herein irreparably

harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no

plain, speedy, or adequate remedy at law.

130.   Wherefore, Riverkeeper prays for relief as hereinafter set forth.

### FIFTH CAUSE OF ACTION

**Failure to Conduct Routine Site Inspections and Comply With General
Monitoring, Recordkeeping, and Reporting Requirements
(Violations of 33 U.S.C. §§ 1311, 1342)**

131.   Riverkeeper incorporates by reference all preceding paragraphs as if set forth

herein.

132.   The General Permit requires industrial dischargers to conduct and document

comprehensive site inspections at appropriate intervals, but in no event less frequently than once

a year.  The inspection must ensure that all stormwater discharges are adequately controlled and

that all BMPs are functioning as expected.  *See* General Permit, Part IV.A.1.  Records of this

inspection must be kept for five years.  *See* General Permit, Part IV.A.2.

133.   In addition, qualified facility personnel must carry out routine inspections at least

quarterly.  *See* General Permit, Part III.C.7.b.2.  During these inspections, personnel must

evaluate conditions and maintenance needs of stormwater management devices, detect leaks and

ensure the good condition of containers, evaluate the performance of the existing stormwater

BMPs described in the SWPPP, and document any deficiencies in the implementation and/or

adequacy of the SWPPP.  *See* General Permit, Part III.C.7.b.1 and b.3.  Such deficiencies must

then be addressed through corrective actions.

134.   All covered facilities also must conduct multiple types of analytical monitoring as

described in Part IV.B of the General Permit and must keep records of their monitoring efforts in

accordance with Parts IV.B and IV.E of the General Permit.  The monitoring required under the

General Permit includes both various visual inspections and collection and laboratory analysis of water quality samples.

135.    In addition, Defendants engage in industrial activities that fall within Sector E of the General Permit's classifications of industrial activity, and therefore must also conduct additional analysis of water quality samples for a range of pollutant parameters as set forth in Part VIII of the General Permit.  *See* General Permit, Part VIII (requirements for Sector E). These include:

    a.   Total suspended solids

    b.   Total Recoverable Iron; and

    c.   pH.

136.    Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not conducted any of the site inspections, monitoring, and testing required by Parts III, IV, and VIII of the General Permit. The General Permit.

137.    Defendants have failed, and continue to fail, to comply with the inspection, monitoring, and testing requirements of the General Permit.

138.    Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants also have failed to retain records and submit monitoring reports as required by Parts IV and VIII of the General Permit.

139.    Each and every day on which Defendants fail to comply with any of the General Permit's inspection, monitoring, testing, recordkeeping and reporting requirements is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

140.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

141.    Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit
Requirements Applicable to Ready Mix Concrete Plants
(Violations of 33 U.S.C. §§ 1311, 1342)**

142.    Riverkeeper incorporate by reference all preceding paragraphs as if set forth herein.

143.    The General Permit contains various requirements specific to ready mix concrete plants.  *See* General Permit, Part VIII (requirements for Sector E).  These include:

a.  A requirement to include in the SWPPP and annual reports to DEC a description of measures that ensure that process wastewater that results from washing of trucks, mixers, transport buckets, forms or other equipment are discharged in accordance with a separate SPDES permit or are recycled.

b.  A requirement to identify in the SWPPP the locations of any baghouse or other dust control device; and any recycle/sedimentation pond, clarifier or other device used for the treatment of process wastewater and the areas that drain to the treatment device.

c.  A requirement that site inspections take place while the Facility is in operation and shall include all of the following areas that are exposed to stormwater:

- Material handling areas

- Aboveground storage tanks

24

- Hoppers or silos,

- Dust collection/containment systems

- Truck wash down/equipment cleaning areas

    d.  A requirement to sweep the Facility weekly to prevent or minimize the discharge of cement and aggregate.

    e.  A requirement to, if practicable, store cement and any other fine granular solids in enclosed silos or hoppers, buildings, or under other covering.

144.    Defendants have failed, and continue to fail, to comply with these requirements of the General Permit that apply to all ready mix concrete plants.

145.    Each and every day on which Defendants fail to comply with the General Permit's requirements applicable to ready mix concrete plants is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

146.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

147.    Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

148.    Wherefore, Plaintiff Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

    (a)    Declare Defendants to have violated and to be in violation of the Act as alleged herein;

(b)     Enjoin Defendants from discharging pollutants from the Facility except as authorized by and in compliance with a NPDES permit;

(c)     Order Defendants to immediately apply for coverage under, and comply fully with all applicable requirements of, the General Permit (or an individual permit that is at least as stringent);

(d)     Order Defendants to take appropriate actions to remediate the harm caused by the violations of their NPDES permit and the CWA, to the extent possible;

(e)     Order Defendants to pay civil penalties of $37,500 per day per violation for all violations of the Act occurring after January 12, 2009, as provided by Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 – 19.4;

(f)     Order Defendants to pay the costs of litigation, including Plaintiff's reasonable investigative costs, attorneys fees, witness, and consultant fees, and other costs, in accordance with Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

(g)     Award any such other and further relief as this Court may deem appropriate.

Dated this 16th day of June, 2014      Respectfully submitted,
New York, New York

By:     /s/ Edan Rotenberg
          Edan Rotenberg (ER-0755)
          Reed Super (RS-3615)
          SUPER LAW GROUP, LLC
          131 Varick Street, Suite 1033
          New York, New York 10013
          212-242-2355
          855-242-7956
          edan@superlawgroup.com
          *Attorneys for Plaintiff Riverkeeper, Inc.*

27